1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
9

10   DEMETRIUS JAMES,                      CASE NO. C10-1612JLR

11                  Plaintiff,             ORDER ON DEFENDANTS'
                                           MOTION FOR SUMMARY
12          v.                             JUDGMENT

13   CITY OF SEATTLE, et al.,

14                  Defendants.

15                    I.      INTRODUCTION

16          Before the court is Defendants City of Seattle ("the City"), David Bunge ("Officer

17   Bunge"), Jonathon Chin (Officer Chin"), Gerald House ("Officer House"), and Seattle

18   Police Department's ("the Department") motion for summary judgment (Dkt. # 13).  In

19   their motion, Defendants move to dismiss on summary judgment (1) all federal 42 U.S.C.

20   § 1983 claims of excessive force (*see* Compl. (Dkt. # 4-1) ¶¶ 5.34-5.38) based on the

21   qualified immunity of the three police officers, (2) all claims based on racial profiling

22   (*see id.* ¶¶ 5.30-5.31), and (3) the remaining state law claims for assault and battery (*see*

*id.* ¶¶ 5.1-5.12) and negligence (*see id.* ¶¶ 5.13-5.21).[1]  Having reviewed the motion, all

papers filed both in support and opposition thereto,[2] the relevant law, and having heard

the argument of counsel on December 8, 2011, the court GRANTS in part and DENIES

in part Defendants' motion (Dkt. # 13).

## II.    BACKGROUND

On July 6, 2009, Seattle Police Officers House and Chin were on a routine patrol

in a Seattle Police Department fully-marked, patrol vehicle.  (Rousso Decl. (Dkt. # 19)

Ex. C (House Statement); Lynch Decl. (Dkt. # 15) Ex. A. (James Dep.) at 52:25-53:3.)

Both officers were dressed in full patrol uniforms.  (*Id.*; James Decl. (Dkt. # 18) ¶ 9.)

Officer House has testified that as he was driving on South Jackson Street, he noticed a

white Lexus sedan backed into a parking spot in a mini-mart parking lot.  (*See* Lynch

---

[1] Defendants also have moved for dismissal on summary judgment of Plaintiff Demetrius James's claims against the Department for negligent training and supervision (*see* Compl. ¶¶ 5.22-5.28).  (Mot. (Dkt. # 13) at 24.)  In his response (Resp. (Dkt. # 17) at 19), Mr. James concedes that these claims should be dismissed on the basis of a recent ruling by the Washington Court of Appeals that "[u]nder Washington law . . . a claim for negligent hiring, training and supervision is generally improper when the employer concedes the employee's actions occurred within the course and scope of employment."  *LaPlant v. Snohomish Cnty.*, --- P.3d ---, 2011 WL 3311236, *2 (Wash. Ct. App. 2011).  Accordingly, the court dismisses Mr. James claims for negligent training and supervision against the Department.

[2] In their reply, Defendants assert that Mr. James's response was filed two days late, and therefore should be stricken as untimely and considered an acknowledgment that Defendants' motion is meritorious.  (Reply (Dkt. # 20) at 1-2.)  Local Rule W.D. Wash. CR 7(b)(2) states that "[i]f a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit."  The Rule is permissive, not mandatory.  The court declines to apply it here where Mr. James's response was ultimately filed, albeit two days late.

Decl. Ex. C (House Statement).)[3]  The vehicle was parked with its rear end pointing toward the street and its front end pointing toward the store front.  (Lynch Decl. Ex. A (James Dep.) at 53:9-11; Ex. J (House Test.) at 159:6-160:7; 161:7-15, 162:14-22; 194:13-195:20; *see also* Ex. I (House Video).)[4]

Officer House has testified that the vehicle caught his attention because it looked like a white Lexus sedan driven by a known drug dealer in the area, identified as W.D.F., with whom Officer House has had repeated contact over the years.  (*Id.* Ex. J (House Test.) at 159:6-160:7; 161:7-15, 194:13-195:20.)  Officer House has testified that because he thought he recognized the sedan, he took note of its rear license plate number as he drove behind it on South Jackson Street.  (*Id.*)  Officer House has testified that he pulled into the parking lot to confirm whether the sedan was in fact W.D.F.'s vehicle.  (*Id.* Ex. J (House Test.) at 161:21-163:12.)  It was not, but he noticed that the front license plate did not match the back license plate.  (*Id.*)  In Officer House's experience, mismatched plates can be associated with a stolen vehicle, as car thieves often swap out plates to avoid detection.  (*Id.* at 163:4-23.)

---

[3] Officer House was the driver of the patrol vehicle.  Officer Chin was the passenger. (Lynch Decl. Ex. J (House Test.) at 161:16-18.)

[4] In the context of a motion for summary judgment, the court "must credit the video evidence submitted by [the parties], and consider all evidence in the light most favorable to [the non-moving party]." *Menotti v. City of Seattle*, 409 F.3d 1113, 1150 (9th Cir. 2005); *Fillmore v. Sharp*, No. 2:10cv00620 JWS, 2011 WL 5191369, at *3 (D. Ariz. Nov. 2, 2011) ("Where video evidence contradicts a party's version of the events, on a motion for summary judgment a court must accept as depicted the video provided . . . .") (citing *Scott v. Harris*, 550 U.S. 372, 379, 380-81 (2007)).

1      Mr. James has brought claims of racial discrimination against Officers Chin and

2  House, alleging that they decided to investigate the Lexus sedan "based solely on the skin

3  color of the occupants." (Compl. ¶¶ 5.29-5.33.)  Mr. James contends that it is a disputed

4  issue of fact concerning whether Officer House initially targeted the sedan because of its

5  possible connection to a known drug dealer.  (Resp. at 3.)  Mr. James contends that if

6  Officer House had initially targeted the sedan for this reason, he would have noted this

7  fact in the initial report he wrote on July 6, 2009.   In his report, however, Officer House

8  does not refer to his familiarity with W.D.F.'s car, but rather states, "As I passed by the

9  car on S Jackson St, I noted it's rear plate and that 4 B/Ms were onboard." (Rousso Decl.

10 Ex. C (House Statement).)[5]  Mr. James also asserts that the initial frames of the video

11 evidence from Officer House's patrol car show cars parked on South Jackson Street in

12 such a way that they would have impaired Officer House's view of the Lexus as the

13 patrol car drove by on South Jackson Street, undermining Officer House's assertion that

14 he "noted" the rear plate so that he could drive around and compare it to the front plate.

15 (Resp. at 3-4 (citing Lynch Decl. Ex. I (House Video: first frame).)

16     Officer House pulled the patrol car into the parking lot and parked it with the nose

17 of the patrol car positioned in front of and perpendicular to the nose of the Lexus sedan.

18 (*See* Lynch Decl. Ex. A (James Dep.) at 52:22-24; Ex. I (House Video).)  Officer House

19 

20     [5] Mr. James also attempts to dispute the fact that Officer House "noted" the sedan's plates
   based solely on the fact that Officer House did not "run" the plates.  (Resp. at 3.)  Although it is
21 true that Officer House did not "run" the plates (Rousso Decl. Ex E (House Test.) at 41:9-21),
   there is no evidence to support Mr. James's contention that there is a connection between Officer
22 House's failure to "run" the plates and the credibility of Officer House's testimony that he took
   note of the plates initially.

did not activate the lights bar on his vehicle. (James Decl. ¶ 8.) Both officers exited their patrol car and approached the Lexus sedan. (Rousso Decl. Ex. C (House Statement); Lynch Decl. Ex. G (Chin Statement) Ex. I (House Video).) Officer House approached the passengers' side of the sedan, while Officer Chin approached the driver's side. (James Decl. ¶ 10; Lynch Decl. Ex. A (James Dep.) at 56:22-57:9.)

Upon exiting the vehicle, Officer House can be seen in the patrol car video pointing his hand in the direction of the sedan. (Lynch Decl. Ex. I (House Video).) One of the rear passengers had exited the sedan and turned away from Officer House, keeping his right hand hidden behind him. (Rousso Decl. Ex. C (House Statement).) Officer House ordered the passenger back into the vehicle. (*Id.*) Officer Chin also ordered the passenger to stay inside the vehicle. (Lynch Decl. Ex. G (Chin Statement).) The passenger complied with the officers' orders and got back into the vehicle. (*Id.*; Rousso Decl. Ex. C (House Statement).)

The driver of the Lexus sedan was Plaintiff Demetrius James. (James Decl. ¶ 3.) He had two passengers, both of whom were sitting in the rear seat of the vehicle. (*See id.* ¶¶ 5, 21; Lynch Decl. Ex. A (James Dep.) at 51:16-18.) At the time that Officers House and Chin approached his vehicle, Mr. James has admitted that he knew that the plates on the front and back of the sedan did not match. (Lynch Decl. Ex. A (James Dep.) at 45:16-22.) Mr. James also has admitted that he saw the officers in their fully-marked patrol car pull up "in front of" or "kitty-corner" to his car. (*Id.* at 51:22-54:7.) He further has admitted that the patrol car completely blocked his exit from the parking lot to the left, and that to access the exit on the right side of the parking lot would require execution

of a three point turn with the sedan.  (*Id.*)  He also has admitted that there was no one else in the parking lot at the time the officers approached his vehicle.  (*Id.* at 54:11-13.)

After his passenger reentered the sedan, Mr. James put the Lexus in gear and began to move forward and to the right – in the first leg of the three-point turn he would need to execute in order to exit the parking lot.  (James Decl. ¶¶ 12-13; Lynch Decl. Ex. I (House Video); *see* Rousso Decl. Ex. C (House Statement).)  Mr. James has testified that as Officer Chin approached the driver's window, the two made eye contact and Officer Chin nodded at him.  (James Decl. ¶ 11.)  Mr. James has stated that he understood Officer Chin's nod as recognition that Mr. James was not the person for whom the officers were looking.  (*Id.*)  Based on Officer Chin's nod, Mr. James has testified that he believed he was free to go.  (*Id.* ¶ 12.)

Officer Chin has stated that the driver's window of the sedan was rolled partially down.[6]  (Lynch Decl. Ex. G (Chin Statement).)  Officer Chin has stated that he pounded on Mr. James's window to get his attention and repeatedly instructed Mr. James to stop and shut the vehicle off.  (Lynch Decl. Ex. G (Chin Statement).)[7]  Mr. James, however, has stated that he did not see Officer Chin make an attempt to speak to him, nor hear any words from Officer Chin.  (James Decl. ¶ 11.)  Further, Mr. James was playing music in his car.  (Lynch Decl. Ex. A (James Dep.) at 61:21.)  On summary judgment, the court

---

[6] Mr. James has testified that the mechanism on the window was broken so that it could not be raised or lowered.  (James Decl. ¶ 10; Lynch Decl. Ex. A (James Dep.) at 61:15-17.)

[7] Officer House also has testified that he told Mr. James to stop the car, but he has admitted that he does not know if Mr. James heard his instructions or not.  (Lynch Decl. Ex. J (House Test.) at 169:2-18.)

credits as true Mr. James's testimony that he did not hear Officer Chin's instructions to stop and that he believed that he was free to go.

At this point, events in the parking lot began to spiral rapidly. As the sedan began to execute the first leg of its three-point turn, Officer House can be seen in the patrol car video moving quickly to the front passenger window with his taser drawn. (*Id.*) He discharged his taser in dart-mode into the front passenger window. (*Id.*; Lynch Decl. Ex. G (Chin Statement).) Officer James has testified that before he deployed his taser he warned Mr. James to stop or he would be tased. (Lynch Decl. Ex. J (House Test.) at 169:24-170:4.) Mr. James, however, has testified that Officer House shouted at him and simultaneously discharged his taser. (James Decl. ¶ 16.) One taser dart lodged in Mr. James's chest, and the other lodged in his neck. (*Id.* ¶ 17.) Mr. James has testified that, at the time he was tased, he had already placed the Lexus sedan into reverse gear. (*Id.* ¶ 19.) He has testified that he was overcome with pain and lost all control of his neuromuscular system. (*Id.* ¶ 18.) The sedan then moved rapidly in reverse while turning right and toward the convenience store (in the second leg of the three-point turn). (Lynch Decl. Ex. I (House Video); Ex. G (Chin Statement); Rousso Decl. Ex. C (House Statement); James Decl. ¶¶ 20-21.) As the sedan moved in reverse, it came close to striking Officer House. (Lynch Decl. Ex. G (Chin Statement); Ex. I (House Video).) Mr. James has testified that because he had been tased, he was no longer in control of the vehicle. (James Decl. ¶ 20.)

The evidence before the court is that the taser stopped after two-seconds, rather than after the typical five-second default cycle. Each taser is equipped with a mechanism

to track the time and duration of every discharge. (*See* Lynch Decl. Ex. H.) The download report from Officer House's taser shows a two-second cycle during the time of the incident with Mr. James. (*Id.*) Mr. James tries to assert that there is an issue of fact concerning whether Officer House attempted to apply a five-second discharge, made a conscious decision to cut-off the discharge after two-seconds, or whether the discharge stopped because a wire attached to the taser broke as the sedan moved in reverse. (*See id.* Ex. I (House Video).) Officer House's testimony, however, is consistent that he believed that the taser wire broke when the sedan moved in reserve. (Rousso Decl. Ex. E (House Test.) at 27:20-24; Lynch Decl. Ex. J (House Test.) at 173:12-179:2.)

The sedan stopped before striking the convenience store and then suddenly lurched forward (in the last leg of the three-point turn). (*Id.* Ex. I (House Video); James Decl. ¶ 23.) Mr. James has testified that one of his passengers, who was seated in the rear of the vehicle and feared a collision, reached forward and slapped the gearshift from reserve to drive. (*Id.* ¶ 21.) Mr. James has testified that he was still incapacitated at this point in time and not in control of the vehicle. (James Decl. ¶ 22.) He has stated that his hands were not on the steering wheel, and his foot was not on the gas pedal. (*Id.*)

Officer Chin, who had moved in front of the vehicle at the time it was in reverse, now found himself in front of a forwarding moving vehicle when the sedan lurched forward. (Lynch Decl. Ex. I (House Video); Ex. G. (Chin Statement).) The sedan was just a short distance from Officer Chin and (in the video) appeared to accelerate rapidly toward him. (*Id.* Ex. I (House Video).) Officer Chin responded by firing five gunshots at the driver into the front windshield of the sedan, while simultaneously backpedaling

away from the path of the sedan. (James Decl. ¶ 23; Lynch Decl. Ex. G (Chin Statement).) One of Officer Chin's bullets struck Mr. James in his right wrist. (James Decl. ¶ 23.) The sedan nearly strikes Officer Chin. (Lynch Decl. Ex. G (Chin Statement); Ex. I (House Video).) Officer Chin has stated that he believed that his life was in danger and that the driver would have run him or anyone else over to flee the scene. (*Id.* Ex. G (Chin Statement).)

At this point, the sedan exits the parking lot and makes a ninety-degree, left-hand turn onto South Jackson Street. (Lynch Decl. Ex. I (House Video); Ex. G (Chin Statement); Rousso Decl. Ex. C (House Statement).) Mr. James has testified that the sedan "rolled out onto South Jackson Street" and that he was not in control of the vehicle. (James Decl. ¶¶ 25-26.) Mr. James has stated that he jumped out of the vehicle before it came to a stop on South Jackson Street and began running from the scene southbound on 18th Avenue South. (*Id.* ¶ 27.) As he was running, he removed his shirt and wrapped it around his injured wrist. (Lynch Decl. Ex. A (James Dep.) at 74:14-24.) A few minutes later, Mr. James heard Seattle police officers yelling "stop" at the corner of South Lane Street and 18th Avenue South. (*Id.* ¶ 29.) He stopped and complied with their orders. (*Id.* ¶ 30.) He laid face down on the sidewalk of 18th Avenue South. (*Id.* ¶ 31.) One officer stood a few feet away with her service revolver drawn and aimed at Mr. James, and another officer stood with his boot on Mr. James's back. (*Id.* ¶ 32; Bunge Decl. (Dkt. # 14) ¶ 4 & Ex. A (Bunge Video).)

Meanwhile, Officers House and Chin lost sight of the sedan once it turned left onto South Jackson Street. (Rousso Decl. Ex. C (House Statement); *see* Lynch Decl. Ex.

I (House Video).)  Both officers immediately returned to their patrol car and commenced a pursuit of the sedan.  (*See* Rousso Decl. Ex. C (House Statement); Lynch Decl. Ex. G (Chin Statement), Ex. I (House Video).)  The officers turned left onto South Jackson Street, and Officer House said "gun" in reference to a gun that is lying in the middle of South Jackson Street.  (Lynch Decl. Ex. C (Chin Statement), Ex. I (Hosue Video); *see* Rousso Decl. Ex. C (House Statement).)  The officers found the sedan on South Jackson Street where it had come to a stop by striking a responding patrol vehicle.  (Rousso Decl. Ex. C (House Statement); Lynch Decl. Ex. G (Chin Statement), Ex. I (House Video).)

During the time of the foregoing incident, Officer Bunge was on patrol in fully-marked Seattle police patrol car.  (Bunge Decl. ¶ 2.)  He heared a "shots fired" call on the radio.  (*Id.*)  Officer Bunge has stated that a "shots fired" call is a rare event and among the most serious of calls that a police officer can receive.  (*Id.*)  Officer Bunge responded to the call, and drove several blocks before he saw two other police officers detaining Mr. James.  (*Id.* ¶¶ 3-4.)  When Officer Bunge arrived at the scene, he was told that Mr. James was injured and so he put on gloves.  (*Id.* ¶ 5.)  Mr. James had not yet been searched for weapons.  (*Id.* ¶ 6.)  Accordingly, Officer Bunge decided to place Mr. James in handcuffs to conduct a weapons search.  (*See id.* ¶ 7.)  Because Officer Bunge observed the gunshot wound on Mr. James's wrist, he opted to use a "double-handcuff" technique.  (*Id.*)  A "double-handcuff" involves linking two pairs of handcuffs together to form a chain that is essentially double the length of an ordinary set of handcuffs.  (*Id.*)  The purpose of using such a technique was to alleviate any pressure on Mr. James's arm, thereby reducing any pain that might result from the handcuffing.  (*Id.*)  Officer Bunge

has testified that (1) he placed the handcuff on Mr. James's right forearm in a manner avoiding his injured wrist, (2) he applied the cuff relatively loosely, and (3) he applied the handcuffs as gently as possible so that Mr. James would not have to move his right arm unnecessarily. (*Id.*) Finally, he applied first aid and dressed the wound with a wrapping gauze.[8] (*Id.* ¶ 8.) The foregoing events concerning the handcuffing of Mr. James were recorded on Officer Bunge's patrol car video. (*Id.* Ex. A.)

Despite Officer Bunge's attempts to minimize the impact of the handcuffs upon Mr. James, Mr. James has testified that he suffered "excruciating pain" as a result. (James Decl. ¶ 36.) Indeed, Mr. James can be heard repeatedly screaming in pain on Officer Bunge's patrol car video as he is being handcuffed and afterwards. (Bunge Decl. Ex. A (Bunge Video); *see also* James Decl. ¶ 36.) The medics arrived within a few minutes. (*See* Bunge Decl. ¶ 8; Ex. A (Bunge Video).) Officer Bunge accompanied Mr. James in the ambulance as the medics transported him to the hospital. (Bunge Decl. ¶ 8.)

Following the foregoing events, Mr. James was charged with assault in the second degree based on the allegation that he had attempted to strike Officer Chin with the Lexus sedan. (James Decl. ¶ 37.) He was tried in February 2010, but the trial ended in a hung jury. (*Id.* ¶ 38.) He was tried again in June 2010, but the court declared a mistrial. (*Id.* ¶ 39.) By the date of his third trial on September 13, 2010, Mr. James had already been incarcerated for fourteen months and served his presumptive sentence. (*Id.* ¶¶ 40-41.) When he was informed that there might be a delay with the third trial, he decides to plead

---

[8] Officer Bunge had been an emergency room technician for nine years prior to becoming a police officer. (Bunge Decl. ¶ 8.)

guilty to a lesser charge of felony assault in the third degree in order to obtain his immediate release. (*Id.* ¶¶ 40, 42; Lynch Decl. Ex. E.) In so pleading, Mr. James expressly admitted that he "intentionally assaulted" Officer Chin "by driving a car in his direction." (Lynch Decl. Ex. E.)

## III.    ANALYSIS

### A.  Standards

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658.

### B.  Mr. James's § 1983 Claims for Excessive Force

The court begins by considering Defendants' motion for summary judgment based on the officers' assertion of qualified immunity. Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights about which a reasonable person would have known. *Mattos v. Agarano,* --- F.3d ---, 2011 WL 4908374, at *5 (9th

Cir. Oct. 17, 2011) (citing *Pearson v. Calahan,* 555 U.S. 223, 231 (2009)). In determining whether an official is entitled to qualified immunity, courts apply a two-step test: First, the court must determine if, taking the facts in the light most favorable to the non-moving party, the officer violated one of the plaintiff's constitutional rights. *Id.* Second, if the answer to the first question is "yes," then the court must "determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question." *Id.* (quoting *Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009)); *see also Bryan v. MacPherson,* 630 F.3d 805, 823 (9th Cir. 2010). The court examines these steps in turn.

All allegations that law enforcement officers have used excessive force are examined under the Fourth Amendment and its reasonableness standard, and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Smith v. City of Hemet*, 394F.3d 689, 700 (9th Cir. 2005). The Supreme Court has declared that the "reasonableness" inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him or her. *Graham*, 490 U.S. at 397. The court applies *Graham* by first considering the nature and quality of the alleged intrusion, and then considering the governmental interests at stake by looking at: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Mattos,* 2011 WL 4908374, at *6. The court's consideration of reasonableness, however, is not limited to these three factors. Rather, the court must consider the totality of the circumstances and weigh the

gravity of the intrusion against the government's interest to determine whether the force employed was constitutionally reasonable. *See Miller v. Clark Cnty.*, 340 F.3d 959, 968 (9th Cir. 2003); *see also Mattos*, 2011 WL 4908374, at *6 ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated . . . when additional facts are necessary to account for the totality of circumstances in a given case."). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment . . . in excessive force cases should be granted sparingly." *Id.* (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Here, Mr. James has alleged that the officers used excessive force against him in three instances: (1) when Officer House fired his taser, (2) when Officer Chin fired five shots into the front windshield of the sedan, and (3) when Officer Bunge applied handcuffs. The court analyzes each allegation of excessive force separately.

### 1. Officer House's Use of His Taser

The first use of force at issue was when Officer House discharged his taser in dart-mode through the passenger window of the sedan and struck Mr. James. Like the court in *Mattos*, this court begins its analysis by considering the nature and quality of the force used against Mr. James. *See Mattos,* 2011 WL 4908374, at *6; *see also Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (stating that the Graham factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."). The Ninth Circuit has "held that tasers used in dart-mode 'constitute an intermediate, significant level of force.'" *Mattos*, 2011 WL 4908374, at *7

1   (quoting *Bryan*, 630 F.3d at 826).  The use of such force must be justified by a strong

2   governmental interest that compels its use.  *See Bryan*, 630 F.3d at 826.

3       In evaluating the government's interests at stake, the court considers the first

4   *Graham* factor, which is the severity of the crime at issue.  *Mattos*, 2011 WL 4908374, at

5   *6.  At the time that Mr. James was tased, the only crime that Officer House had

6   observed was the display of mismatched license plates.  Although this may have led

7   Officer House to suspect that the vehicle may have been stolen, there was no concrete

8   indication of any theft.[9]  The court has little difficulty concluding that only crime that the

9   officers had actually observed—the display of mismatched license plates—was not a

10  serious offense.  *See Mattos*, 2011 WL 4908374, at *8 (noting that failure to sign a traffic

11  citation, trespassing, and obstructing a police officer were not serious crimes).  The Ninth

12  Circuit has found that misdemeanors that are not "inherently dangerous or violent" do not

13  justify a significant use of force.  *Bryan*, 630 F.3d at 829 & n. 12.

14      Next, the court considers the second *Graham* factor, which is whether Mr. James

15  posed an immediate threat to the safety of the officers or others.  This is the "most

16  important single element" of the governmental interests at stake.  *Mattos*, 2011 WL

17  4908374, at *8 (quoting *City of Hemet*, 394 F.3d at 702).  At the time that Officer House

18  discharged his taser, there was little, if any, evidence that Mr. James posed an immediate

19  threat to the officers or others.  The only evidence in this regard is Officer House's

20

21  _____

    [9] The court notes that the vehicle, in fact, was not stolen.  It belonged to Mr. James's
22  girlfriend, and he was using it with her permission.  (Lynch Decl. Ex. A (James Dep.) at 45:10-
    22.)

testimony that he was unable to see what, if anything, was in the right hand of the rear passenger who had briefly exited the vehicle. (Rousso Decl. Ex. C (House Statement).) Nevertheless, this passenger had immediately complied with the officers' commands to return to the vehicle. No one in the sedan had overtly or implicitly threatened the officers prior to the tasering.

Third, the court considers whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Mattos,* 2011 WL 4908374, at *6. Here, Mr. James has testified that he thought he was free to go based on a nod that he received from Officer Chin. (James Decl. ¶ 11.) On summary judgment, the court is required to and does credit this evidence as true. However, the "reasonableness" inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 397. Thus, although the court must analyze the evidence in a light most favorable to Mr. James, it must also do so from the perspective of a reasonable officer in the shoes of Officer House. *See Torres v. City of Madera*, 684 F.3d 1119, 1124 (9th Cir. 2011). Thus, the court must consider whether, from Officer House's perspective, a reasonable officer would have viewed Mr. James's actions as either resisting arrest or attempting to flee. *See Thomas v. Durastani*, 607 F.3d 655, 667 (10th Cir. 2010) ("Accepting the district court's characterization of the dispute as a dispute over whether the occupants of the [vehicle] *heard* [the officer] identify himself – as opposed to whether he actually *did* identify himself – is immaterial. We must view the events from the perspective of the officer, not the occupants of the [vehicle].") (italics in original).

Both officers have testified that they ordered Mr. James to stop the car, although Officer House has admitted that he does not know if Mr. James heard his commands or not.  (Lynch Decl. Ex. G (Chin Statement), Ex. J (House Test.) at 169:2-18.)  In *Thomas*, the Tenth Circuit held that an officer's failure to identify himself could be viewed as reasonable "given the trooper's marked patrol car behind the [vehicle], its emergency lights, and [the passenger's] apparent compliance with the trooper's directive to [he] get back into the [vehicle]."  607 F.3d at 667.  The facts here are remarkably similar.  Even if we assume that Officers House and Chin failed to identify themselves or communicate in such a way that Mr. James could hear them, "[a] reasonable officer could certainly conclude that the [vehicle's] occupants had notice of police presence" and "were pulling away from a traffic stop."  *Id.* at 665.  Although the officers had not engaged their emergency lights, they were driving a marked vehicle, and were dressed in full patrol uniforms.  They had stopped their police vehicle in front of the suspect car, and, as Mr. James has admitted, there was no one else in the parking lot toward whom the officers' interest might have been directed.  Further, one of Mr. James's passengers had complied with the officers' orders to get back inside the sedan.  A reasonable officer in Officer House's shoes could conclude in these circumstances that Mr. James was attempting to flee a traffic stop in the face of a clear show of authority by the police.  *Id.*  The active evasion or flight by a non-felon generally favors a police officer's use of non-deadly force.  *See Miller*, 340 F.3d at 965-66.

Finally, the court "must examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in

*Graham.*'" *Mattos*, 2011 WL 4908374, at *8 (quoting *Bryan*, 630 F.3d at 826.) One such factor here is the lack of warning prior to Officer House's use of his taser. Although Officer House testified that he warned Mr. James to stop or he would be tased (Lynch Decl. Ex. J (House Test.) at 169:24-170:4), Mr. James testified that Officer House shouted at him and simultaneously discharged the taser (James Decl. ¶ 16). A jury may find otherwise, but on summary judgment, the court must credit Mr. James's testimony and conclude that there was no warning prior to Officer House's deployment of his taser.

In addition, the court also considers that Mr. James was in the midst of operating a vehicle with two passengers at the time he was tasered. The risk of injury from tasering a driver in control of a moving vehicle—not not only to the driver, but also to the passengers, the officers, and other persons in the area—is something that a police officer trained in the use of a taser should foresee. *See Bryan*, 630 F.3d at 824 (noting that a reasonable officer trained in the use of a taser would foresee a risk of injuring a shirtless man tasered while standing on asphalt); *see also Bing v. City of Whitehall*, 456 F.3d 555, 570 (6th Cir. 2006) (finding that the government has no interest in use of method of force that creates additional risk to others). Indeed, Mr. James has asserted that he lost control of the vehicle as result of the tasing, and that this placed everyone in the vehicle, as well as the officers at the scene, at risk of injury.

In light of the factors above, and viewing the evidence in the light most favorable to Mr. James, the court concludes that the evidence supports more than one reasonable inference and that a reasonable jury could find a Fourth Amendment violation. The key considerations that could lead a jury to find a Fourth Amendment violation are: (1) the

non-serious, non-violent nature of the crime observed by the officers; (2) the lack of an immediate threat to the officers or third persons just prior to use of the taser; (3) the lack of a warning prior to deployment of the tase;, and (4) the nature of the force involved as amplified by the fact that Mr. James was operating a moving motor vehicle.  As noted above, the use of a taser in dart mode constitutes an intermediate and significant quantum of force.  Something more than a nonviolent misdemeanor must be at play to justify its use.  Although Mr. James was in flight from the perspective of a reasonable officer at the scene, the court cannot say as a matter of law that Mr. James's flight made use of the taser reasonable given the countervailing factors listed above.   In the absence of an immediate threat posed by Mr. James, a reasonable jury could conclude that the nature of the force and the risk of injury were too great relative to the offense at issue.  *See Bryan*, 630 F.3d at 832.

Having determined that a reasonable jury could conclude that Mr. James's constitutional rights were violated by Officer House's use of his taser, the court must next consider whether Officer House nevertheless is entitled to qualified immunity because the constitutional violation described above was not "'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. Al-Kidd*, --- U.S. ---, 131 S.Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Mattos*, 2011 WL 4908374, at *5 (explaining that the court must "determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question").  The alleged violation did not occur until July 6, 2009.  The Ninth Circuit did not declare that a

taser used in dart mode constituted an intermediate use of force until the court's 2010

decision in *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  In *Bryan*, the Ninth

Circuit granted the officers qualified immunity precisely because the state of the law

surrounding taser use was acknowledged to be murky as of the date of the violation.  *Id.*

at 833; *see also Mattos*, 2011 WL 4908374, at *12 ("[A]lthough [the plaintiff] has

alleged an excessive force claim, the law [regarding reasonable use of a taser] was not

sufficiently clear at the time of the incident [in 2004] to render the violation clearly

established.").  Although the events of this case occurred years after the events in *Bryan*,

little binding, on-point case law was issued between when the incidents that occurred in

that case and July 6, 2009.  *See, e.g.*, *Baird v. Ehlers*, No. C10-1540JLR, 2011 WL

5838431, at * 11 (W.D. Wash. Nov. 21, 2011) (holding that lack of clarity in the law

concerning taser use prior to the Ninth Circuit's rulings in *Bryan* and *Mattos* entitles

officer to qualified immunity); *Quyen Kim Dang v. City of Garden Grove*, No. SACV 10-

00338 DOC (MLGx), 2011 WL 3419609, at *9 (C.D. Cal. Aug. 2, 2011).  Given the lack

of clarity in the case authority concerning the level of force employed when a taser is

deployed in dart form prior to the Ninth Circuit's ruling in *Bryan*, the court finds that

Officer House is still entitled to qualified immunity.

### 2.  Officer Chin's Firing of Five Shots at the Vehicle

The court evaluates Officer Chin's use of deadly force when he fired his service

revolver five times at the Lexus sedan under the same *Graham* framework described

above.  *See Smith*, 394 F.3d at 700.  Although the court must view the facts in the light

most favorable to Mr. James, it must also base its "reasonableness" inquiry on whether

Officer Chin's actions were "objectively reasonable" given the facts and circumstances confronting him. *Graham,* 490 U.S. at 397. The critical inquiry is what Officer Chin perceived. *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).

The facts and circumstances confronting Officer Chin at the moment he used deadly force were substantially different than those confronting Officer House at the time he deployed his taser. After Officer House deployed his taser, Officer Chin observed the suspect sedan moving rapidly in reverse (in the second leg of the three-point turn) and coming close to striking Officer House. (Lynch Decl. Ex. G (Chin Statement); Ex. I (House Video).) The video evidence indicates that Officer Chin stepped out in front of the sedan at the time it was moving in reverse and away from him. (*Id.* Ex. I (House Video).) It is only when the sedan suddenly lurched forward that Officer Chin found himself in the path of a rapidly forward moving vehicle.

Mr. James has testified that he was not in control of the vehicle after he was tasered, and on summary judgment the court appropriately credits this testimony as true. Despite this testimony, however, the court must still evaluate Officer Chin's actions from the perspective of a reasonable officer in his shoes. Viewing the video evidence, the sedan does not appear to be out of control in any way. Indeed, after Mr. James is tased, the vehicle perfectly executes the final two segments of the three point turn, albeit at far too rapid a speed for the confines of the parking lot. (*See id.*) Thus, from Officer Chin's perspective, he was now faced with a rapidly moving vehicle that appears to be under the control of its driver. He had already observed the sedan almost hitting Officer House, and it was now accelerating at a rapid rate directly toward him. Officer Chin had, at

most, only a couple of seconds in which to react. (*Id.*)  He fired five shots at the driver

and into the front windshield of the sedan, while simultaneously trying to backpedal away

from the vehicle.  (Lynch Decl. Ex. G (Chin Statement), Ex. I (House Video).)  The

sedan almost hit him.  (*Id.*)  Officer Chin has stated that he "felt [his] life was in danger

and that the driver would run [him] or anyone else over in order to flee the scene."  (*Id.*

Ex. G.)

The circumstances confronting Officer Chin had quickly escalated from a traffic

stop to investigate a minor violation involving mismatched license plates to a potentially

deadly assault on an officer.  Indeed, Mr. James later pleaded guilty to intentionally

assaulting Officer Chin by driving the sedan directly at him.  (Lynch Decl. Ex. E

(Statement of Defendant on Plea of Guilty).)[10]  It is undisputed that a vehicle can be used

as a deadly weapon.  *United States v. Anchrum*, 594 F.3d 1162, 1164 (9th Cir. 2010);

*United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987).  The question the

court must consider is whether the vehicle could reasonably be perceived as a deadly

weapon at the moment of the shooting.  *Acosta v. City & Cnty. of San Francisco*, 83 F.3d

---

[10] "To be considered on a motion for summary judgment, [a] plea agreement must . . . fall within one the exceptions to the hearsay rule." *In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008). As in *Slatkin*, to the extent that Mr. James's plea agreement is offered to prove his intent to assault Officer Chin, it is admissible under Federal Rule of Evidence 807. *See, e.g.*, *id.* at 812. Mr. James, nevertheless, asserts that he chose to plead guilty (rather than stand trial) because he had already been incarcerated for a long time (due to an earlier hung jury and a separate mistrial), and that by pleading guilty he could obtain his immediate release. (James Decl. ¶¶ 37-42.) All of these facts may well be true (and are presumed so on summary judgment), and may explain Mr. James's reasons for choosing to plead guilty rather than waiting to stand trial again. Nevertheless, these facts do not negate Mr. James's admission in his guilty plea that he intentionally assaulted Officer Chin with the sedan.

1  at 1146 n. 9 (9th Cir. 1996).[11]  Viewing the videotaped evidence in a light most favorable

2  to Mr. James, the court concludes that Officer Chin reasonably perceived that the sedan,

3  which was rapidly accelerating in his direction, posed an immediate threat to his safety.

4  Indeed, Mr. James has admited in his response to Defendants' motion for summary

5  judgment that Officer Chin "was firing to save his life."  (Resp. at 17.)[12]

6       The Supreme Court has held that "[w]here an officer has probable cause to believe

7  that the suspect poses a threat of serious physical harm, either to the officer or others, it is

8  not constitutionally unreasonable to prevent escape by using deadly force."  *Tennessee v.*

9  *Garner*, 471 U.S. 1, 11 (1985).  Further, the court must take into account that "police

10  officers are often forced to make split-second judgments—in circumstances that are

11  _____

12  [11] In *Acosta*, the Ninth Circuit found that an officer "shooting at the driver of a slow-
moving car" was not entitled to qualified immunity where "a reasonable officer . . . would have
13  recognized that he could avoid being injured . . . by simply stepping to the side."  83 F.3d at
1146-47.  The facts in *Acosta* are distinct from those here.  In *Acosta*, the officer who fired his
14  weapon at fleeing thieves "had never been in any danger whatsoever."  *Catanho v. United States*,
No. CV 06-2496, 2009 WL 1160256, at *10 n.11 (C.D. Cal. Apr. 28, 2009).  In contrast, Officer
15  Chin found himself in close proximity to and in the direct path of a rapidly accelerating vehicle.
Although he attempted to back-pedal out of the sedan's path, he reasonably perceived the sedan
16  to be an imminent threat to his safety.

17  [12] Mr. James argues that, despite the fact that Officer Chin "was firing to save his life," he
should not be entitled qualified immunity because he negligently violated the Department's
18  policy by placing himself in the path of a moving vehicle.  (Resp. at 5, 17.)  Although the court
does not believe that the video evidence is consistent with Mr. James's characterization of
19  Officer Chin's actions, for purposes of this motion, the court will accept Mr. James's assertion as
true.  The Ninth Circuit has found that a Fourth Amendment violation is not established merely
20  "on bad tactics that result in a deadly confrontation that could have been avoided."  *Billington v.*
*Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002).  "[T]he fact that an officer negligently got himself
21  into a dangerous situation will not make it unreasonable for him to use force to defend himself."
*Id.*; *see also Wren v. United States*, 517 U.S. 806, 815 (1996) ("[P]olice enforcement practices,
22  even if they could be practically assessed by a judge, vary from place to place and from time to
time.  We cannot accept that the search and seizure protections of the Fourth Amendment are so
variable.").

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Torres,* 684 F.3d at 1124 (citing *Graham*, 490 U.S. at 397). The circumstance in which Officer Chin found himself was precisely this type of situation— "tense, uncertain, and rapidly evolving." The incident had quickly turned from one involving a traffic stop to investigate mismatched plates "to one in which the driver of a moving vehicle, ignoring police commands, attempted to accelerate within close quarters of two officers on foot." *Wilkinson*, 610 F.3d at 551 (finding use of deadly force reasonable after driver had failed to yield to police commands and vehicle was accelerating); *see also Levesque v. City of Mesa*, No. 10-16892, 2011 WL 3020034, at *1 (9th Cir. July 25, 2011) (unpublished) (holding that where plaintiff "accelerated his truck in the general direction of the two officers while both officers were on foot," and "[g]iven the officers' proximity to the moving vehicle, it was objectively reasonable for the officers to shoot [the plaintiff], because the moving vehicle posed an immediate threat to the officers' safety"). Based on the videotape evidence, the court cannot conclude that Officer Chin's use of deadly force was constitutionally unreasonable. Accordingly, he is entitled to qualified immunity.

### 3. Officer Bunge's Application of Handcuffs

The court has little difficulty in finding, under the reasonableness standard set forth in *Graham*, that Officer Bunge did not violate Mr. James's Fourth Amendment rights. There is no doubt that Mr. James was in pain as a result of his gunshot wound, and that the pain was significantly exacerbated by the handcuffing. Nevertheless, in the circumstances confronting Officer Bunge, the court finds that his actions were objectively

reasonable.  Officer Bunge was responding to a "shots fired" call.  Mr. James had just committed an assault on a police officer with a vehicle and fled the scene.  Although Mr. James was complying with officers' orders and lying on his stomach on the ground at the time that Officer Bunge arrived at the scene, Officer Bunge's application of handcuffs to Mr. James enabled the other officers to holster their weapons.  The handcuffing also permitted officers to search Mr. James for weapons, which was reasonable to protect their safety in light of the foregoing facts.

Based on Mr. James's screams, which can be heard on the videotape from Officer Bunge's vehicle, there is no doubt that Mr. James experienced additional, and even significant pain, as a result of the handcuffing.  However, Officer Bunge did not ignore Mr. James's injury or the pain inherent in the handcuffing procedure.  He took reasonable steps to minimize Mr. James's discomfort, including:  (1) using a double-cuffing technique to reduce any strain upon Mr. James's injured arm, (2) placing the handcuff relatively loosely above the injured area, (3) and dressing the wound while emergency medical personnel were in route to the scene.  The court also notes that paramedics arrived on the scene within a few minutes, and Officer Bunge accompanied Mr. James to the hospital.

Even in circumstances where an arrestee is not resisting, a use of force (such as the application of handcuffs) may be reasonable under the totality of the circumstances.  *See Startzell v. Velie*, No. C04-5259RBL, 2005 WL 1645802, at *5 (W.D. Wash. July 12, 2005) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 806-07 (9th Cir. 1994) (holding that use of force on non-resisting protestors was reasonable)).  In *Startzell*, the

court held that the application of handcuffs could not be considered excessive under the Fourth Amendment given the violent nature of the crime for which the plaintiff was arrested, which entailed a domestic dispute and allegations of assault and battery. 2005 WL 1645802, at *5. The court here also finds that given the circumstances of Mr. James's recent assault upon Officer Chin, as well as the circumstances under which Officer Bunge was dispatched, which involved a "shots fired" call, the use of handcuffs cannot be considered excessive under the Fourth Amendment.

Nevertheless, the court must also consider whether the manner in which Mr. James was handcuffed was unreasonable. *See id.* The Ninth Circuit has held that excessively tight handcuffing can constitute a Fourth Amendment violation. *See, e.g.*, *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Alexander v. Cnty. of L.A.*, 64 F.3d 1433, 1436 (9th Cir. 1993); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989). However, in each of those cases, the plaintiffs suffered damage to their wrists or hands as a consequence of the handcuffing. *See Powell v. Beverly Hills Police Dep't*, No. CV 06-5082 RGK (FFM), 2008 WL 4821001, at *5 (C.D. Cal. Oct. 30, 2008) (analyzing the Ninth Circuit authority cited above). Here, there is no evidence that the wound to Mr. James's wrist was exacerbated in any way by Officer Bunge's handcuffing technique. Although Mr. James has testified that he suffered "excruciating pain" (James Decl. ¶ 36), he has submitted no evidence, medical or otherwise, that the handcuffing aggravated the prior injury to his wrist. Indeed, the evidence before the

court is that Officer Bunge took reasonable steps to limit the impact of the handcuffing with respect to Mr. James's prior injury.

Once again, the court finds *Startzell* to be instructive. 2005 WL 1645802, at *6-7. In *Startzell*, plaintiff alleged that it was unreasonable for deputies to force his hands behind his back after he informed them that he had a history of rotator cuff injury to his left shoulder, and that officers should have used an alternate technique. *Id.* at *6. He also claimed that the officers used unreasonable force when he complained that the handcuffs were too tight, and they refused to loosen them. *Id.* The *Startzell* court found that there was no evidence in the record that the deputy's actions in fact caused injury to the plaintiff's shoulder, and that accordingly the deputy's "use of [an] accepted law enforcement technique did not constitute the use of unreasonable force." *Id.*[13] The *Startzell* court also found that the lack of medical or other evidence to support any injury as a result of the alleged tightening of plaintiff's handcuffs, other than minor cuts or scapes, also precluded a finding of excessive force. *Id.* at *7 (citing *Rodriguez v.* Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002) (holding that "painful handcuffing, without more, is not excessive force . . . where the resulting injuries are minimal.")). Here, like in *Startzell*, there is no evidence at all that Mr. James's prior injury was exacerbated in any way by Officer Bunge's handcuffing. Accordingly, the court finds as a matter of law that

---

[13] Here, of course, Officer Bunge did employ an alternate technique—double-cuffing—in an effort to reduce any impact upon Mr. James's prior injury. This fact provides further support for the court's conclusion that Officer Bunge's use of handcuffs was reasonable under the circumstances.

1  Officer Bunge's application of handcuffs was objectively reasonable under the

2  circumstances and did not violate Mr. James's Fourth Amendment rights.  Accordingly,

3  Officer Bunge is entitled to qualified immunity.

4       As a result of the court's rulings that all three officers are entitled to qualified

5  immunity, Mr. James's ninth cause of action for excessive force under 42 U.S.C. § 1983

6  against Officers House, Chin, and Bunge (*see* Compl. ¶¶ 5.34-5.38) is dismissed in its

7  entirety on summary judgment.

8       **C.  Mr. James's Claim for Racial Profiling**

9       Officer House's police report notes that he observed four black males sitting in a

10 parked Lexus sedan.[14]  (Rousso Decl. Ex. C (House Statement).)  On this basis, Mr.

11 James alleges that Officer House was engaged in racial profiling .  (*See* Compl. ¶¶ 5.29-

12 5.33; *see* Lynch Decl. Ex. A (James Dep.) at 60:8-9 ("The way he wrote his report is

13 what made it seem like he was basing it on race.").)[15]  Racial profiling can constitute a

14

_____

15      [14] Although Officer House's police report indicates that there were four individuals inside
the sedan, there were apparently only three.  (Lynch Decl. Ex. A (James Dep.) at 51:16-52:1.)  In
16 any event, to the extent that there is a factual dispute concerning the number of passengers inside
Mr. James's vehicle, it is not material to the court's determination of any issue related to this
17 motion for summary judgment.

18      [15] Mr. James has admitted that he is not pursuing any claim of unreasonable seizure, false
arrest, or false imprisonment, except insofar as he alleges excessive force was used in seizing
19 him.  (Lynch Decl. Ex. F (Plaintiff's Resp. to RFA Nos. 9, 10).)  Accordingly, Mr. James has
waived any claim he may have concerning racial profiling under the Fourth Amendment, and his
20 racial profiling claim is properly considered under the Equal Protection Clause of the Fourteenth
Amendment.  In any event, Mr. James has no valid claim for racial profiling under the Fourth
21 Amendment.  In *Whren v. United States*, 517 U.S. 805, 813 (1996), the Supreme Court held that
the illegitimate subjective motivation of a police officer will not invalidate an otherwise
constitutional seizure that is "objectively justifiable" based on facts known to the officer.  *Id.*; *see*
22 *also United States v. Cervantes*, 219 F.3d 882, 890 (9th Cir. 2000) ("It is important to remember

deprivation of a citizen's right to equal protection under the law. U.S. Const. amend. XIV; *Whren v. United States*, 517 U.S. 805, 813 (1996) (holding that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment). The requirements for a claim of racial profiling draw upon what the Supreme Court has called "ordinary equal protection standards." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (noting that requirements for a selective prosecution claim draw on ordinary equal protection standards). To establish a claim of racial profiling, the plaintiff must establish that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Id.*; *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1166-67 (9th Cir. 2005) ("To state a § 1983 claim for violation of the Equal Protection Clause, a plaintiff must show that he was treated in a manner inconsistent with others similarly situated, and

that the foundation of the Court's position in *Whren* is that 'where the search or seizure is based upon probable cause' there is with rare exception no balancing to be done or reasonableness determination to be made because the probable cause itself serves as the exclusive 'measure of the lawfulness of enforcement.'") (quoting Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.4 (3d ed.1996) (footnote omitted)); *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000) ("The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop."). Here, Officers House and Chin had an "objectively justifiable" basis for stopping Mr. James's car—namely, the vehicle's mismatched license plates. Accordingly, any claim for racial profiling by Mr. James must proceed under an equal protection analysis based on the Fourteenth Amendment. *See, e.g.*, *Lacy v. K.L. Villeneuve*, No. C03-2442JLR, 2005 WL 3116004, at *4 (W.D. Wash. Nov. 21, 2005) ("In cases where an officer has probable cause or reasonable suspicion independent of the race of the person he or she detains, the officer's racial motivation does not constitute a Fourth Amendment violation. . . . [The plaintiff's] 'racial profiling' claim is exclusively a Fourteenth Amendment claim.").

that the defendants acted with an intent of purpose to discriminate against plaintiff based upon membership in a protected class.").

The court finds that Mr. James has failed to provide the necessary evidence of the officers' intent to discriminate based on race to support his claim and survive summary judgment. The facts in *Gardner v. Township of Kalamazoo*, No. 4:96-CV-75, 1997 WL 910793 (W.D. Mich. Apr. 9, 1997), are similar to those here. In *Gardner*, plaintiffs asserted that the police report demonstrated that the original traffic stop was motivated by racial discrimination because the officer noted that he observed a black male get into the car and pull out. *Id.* at *4. The court, however, found to the contrary:

> [O]n its face the police report does not demonstrate a racial animus on the part of [the officer]. Nor does it even sustain an inference of racial animus. The record before this Court shows that a car, which was situated in front of a convenience store late in the evening was parked in an unusual manner with its motor running, aroused the suspicion of a police officer. The police officer subsequently pulled the car over for a violation, tinted windows. Nothing in the record demonstrates that the tinted windows did not merit a traffic stop or a ticket.
>
> The Plaintiffs contend that the traffic stop and the events of the evening demonstrate that what transpired was the result of racial discrimination. However, the Plaintiffs have not placed in the record any words or particular actions on the part of the policemen to substantiate their claims. . . .
>
> [I]n order to sustain [the] claim, this Court must have before it specific acts or statements upon which a claim or inference of discrimination can be based. Plaintiffs' perception of events, no matter how sincere, is simply insufficient to sustain [their] claim. As a result, Defendants' motion for summary judgment . . . must be granted.

*Id.* at *4-5. Like the plaintiffs in *Gardner*, Mr. James has pointed to nothing more than Officer House's accurate notation in his police report of the sedan's occupants' race.[16] This is simply insufficient evidence of the officers' alleged racial motivation to survive summary judgment.[17] Accordingly, the court grants Defendants' motion for summary judgment with respect to Mr. James's claim for racial profiling.[18]

### D. Mr. James's Claims for Assault and Battery

Mr. James has brought state law claims of assault and battery against Officer House (Compl. ¶¶ 5.1-5.4), Officer Chin (*id.* ¶¶ 5.5-5.9), and Officer Bunge (*id.* ¶¶ 5.10-

---

[16] Indeed, Mr. James appears to admit that the officers could not have known his race at the time they noticed his sedan and decided to make the traffic stop. He stated during his deposition that his "car had tinted windows," and that therefore Office House "couldn't see nothing else in there." (Lynch Decl. Ex. A (James Dep.) at 60:14-16.) He also admits that Office House did not say anything to him that indicated he was acting based on race. (*Id.* at 60:6-8.)

[17] *Compare Thomas v. Marion Cnty. Oregon Circuit Court*, No. 10-1090-BR, 2010 WL 5067913, at *4 (D. Or. Dec. 6, 2010) (dismissal is appropriate where plaintiff alleges no facts of discriminatory intent on the part of officers making the traffic stop); *Turner v. United States*, No. CIV S-08-2087 EFB P, 2010 WL 4323001, at *2 (E.D. Cal. Oct. 26, 2010) (dismissal is appropriate where plaintiff merely alleges that he is a victim of racial profiling but does not allege facts showing discrimination, or differential treatment of others similarly situated); *with Lacy*, 2005 WL 3116004, at *4 (summary judgment dismissing racial profiling claim is not appropriate where plaintiff produced evidence from an expert who examined comprehensive data of all police department arrests indicating that the officer targeted individuals for traffic stops based on race, as well as evidence concerning officer's assumptions about evidence from which a jury could reasonably infer the existence of racial discrimination).

[18] Mr. James has also asserted his claim for racial profiling under Article I, Sections 3 and 7 of the Washington Constitution. (Compl. ¶ 5.31.) Mr. James, however, provides no analysis under the factors set forth in *State v. Gunwall*, 720 P.2d 808, 811 (Wash. 1996), as to whether, in this context, the Washington Constitution should be considered as extending broader rights to its citizens than the federal Constitution. Accordingly, the court conducts its analysis solely under the federal Constitution. *See, e.g., Hardee v. State, Dep't of Social & Health Servs.*, 256 P.3d 339, 344, n.7 (Wash. 2011) (citing *In re Pers. Restraint of Grasso*, 84 P.3d 859, 868 n.12 (Wash. 2004)).

5.12).  Battery is the intentional infliction of harmful or offensive contact with a person.  *McKinney v. Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000).  An assault is any act that causes a person apprehension that harmful or offensive contact is imminent.  *Id.*  Washington recognizes a form of qualified immunity for law enforcement officers.  *See Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000).  Because the court has already found on summary judgment that the Officers Chin's and Bunge's actions were objectively reasonable and did not entail the use excessive force, the court grants Defendants' motion for summary judgment on the state law assault and battery claims against Officers Chin and Bunge, as well.  *See, e.g.*, *McKinney,* 13 P.3d at 641 ("Having found . . . that the officers' use of force was reasonable, we find that they are entitled to state law qualified immunity for the assault and battery claims."); *McCarthy v. Barrett*, ---- F. Supp. 2d ---, 2011 WL 3159052, at *16 (W.D. Wash. 2011) ("Because Plaintiffs have not produced any evidence from which a reasonable jury could conclude that excessive force was used . . . , Defendants' Motion for Summary Judgment on the [Washington] assault and battery claims is GRANTED.").

 The court's analysis, however, with regard to Officer House reaches a different result.  "Although Washington recognizes a form of qualified immunity for police officers, that immunity is not 'available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest.'"  *Brooks v. City of Seattle*, No. C06-1681RAJ, 2008 WL 2433717, at *7 (W.D. Wash. June 12, 2008), *aff'd in part and rev'd in part on other grounds by Mattos*, 2011 WL 4908374 (quoting *Staats v. Brown*, 991 P.2d at 627-28); *see also Wakgira v. City of Seattle*, No. C08-1108JLR, 2009 WL

2406330, at *13 (W.D. Wash. Aug. 3, 2009) (holding that the same factual issues that prevent summary judgment with regard to excessive force issue of federal civil rights claim also prevent summary judgment with respect to Washington state assault and battery claim).

In *Brooks*, the district court found that the use of a taser by Seattle police officers on a pregnant woman following her refusal to sign a speeding ticket was not objectively reasonable. *Brooks*, 2008 WL 2433717, at *4-6. On the basis of these findings, the district court also held that the officers were not entitled to qualified immunity with regard to the woman's state law claim for assault and battery. *Id.* at *7. The Ninth Circuit reversed with respect to the § 1983 claim, finding that although the officers used excessive force against the pregnant woman, they still were entitled to qualified immunity with respect to her federal § 1983 claim because the law concerning taser use was not clearly established at the time of the incident. *Mattos,* 2011 WL 4908374, at *10-*12. The Ninth Circuit, however, affirmed the *Brooks* district court's ruling that the officers were not entitled to qualified immunity under state law:

> Because we conclude that a reasonable jury could find that the officers used excessive force in tasing [the woman], we affirm the district court's conclusion that the officers were not entitled to Washington state qualified immunity for [the woman's] assault and battery claims.

*Id.* at *12 n. 8. Accordingly, although Officer House is entitled to qualified immunity with regard to Mr. James's federal 42 U.S.C. § 1983 claim because he did not violate clearly established federal law when he tased Mr. James, he is not entitled to qualified immunity or summary judgment with regard to Mr. James's state law claim of assault and

battery. The court, therefore, denies Defendants' motion for summary judgment with respect to Mr. James's assault and battery claim against Officer House.

**E. Mr. James's Claims for Negligence**

Defendants have also moved for summary judgment with respect to Mr. James's claims for negligence against Officer Chin (*see* Compl. ¶¶ 5.13-5.15), Officer House (*see id.* ¶¶ 5.16-5.18), and Officer Bunge (*see id.* ¶¶ 5.19-5.21). (Mot. at 23.) "A cause of action for negligence exists only if 'the defendant owes a duty of care to plaintiff.'" *Osborn v. Mason Cnty.*, 134 P.3d 197, 202 (Wash. 2006) (quoting *Chambers-Castanes v. King Cnty.*, 669 P.2d 541, 547 (Wash. 1983)). Under the public duty doctrine, "[w]hen the defendant is a public official . . . no liability will attach for a public official's negligent conduct unless the plaintiff can show that the duty was owed to [him] rather than to the general public." *Donaldson v. City of Seattle*, 831 P.2d 1098, 1101 (Wash. Ct. App. 1992) (citing *Taylor v. Stevens Cnty.*, 759 P.2d 447, 449-50 (Wash. 1988) ("Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one)." (internal quotations omitted)). Thus, while it is true that the officers "owe[] a general duty to all [] citizens [of the City] to avoid the use of excessive force when effectuating an arrest, it cannot be said that they owe [the plaintiff] a specific duty." *Pearson v. Davis*, No. C06-5444RBL, 2007 WL 3051250, at *4 (W.D. Wash. Oct. 17, 2007); *see also Jimenez v. City of Olympia*, No. C09-5363RJB, 2010 WL 3061799, at *15 (W.D. Wash. Aug. 2, 2010) ("It appears that the public duty

doctrine bars a claim [for negligence arising out of the use of excessive force] against [the] [o]fficers . . . and the City. . . ."); *Nix v. Bauer*, No. C05-1329Z, 2007 WL 686506, at * 4 (W.D. Wash. Mar. 1, 2007) (citing *Donaldson v. City of Seattle*, 831 P.2d 1098, 1105 (Wash. Ct. App. 1992) ("[P]olice responsibility in regard to any further investigation becomes part of their overall law enforcement function and does not generate a right to sue for negligence."). Accordingly, all three officers are entitled to summary judgment as to Mr. James's negligence claims.[19]

## F. Mr. James's Claim of Vicarious Liability or Respondeat Superior Against the City

Mr. James has asserted that the City is liable under the doctrine of respondeat superior for all acts committed by the officers in the course of their employment. (Compl. ¶¶ 5.39-5.41.) Because all of the claims against the officers have been dismissed on summary judgment except for Mr. James's state law claim against Officer House for assault and battery, the only remaining liability, if any, that is viable with respect to the City arises out of Mr. James's claim for assault and battery against Officer House.

## IV. CONCLUSION

Based on the foregoing, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 13). The court GRANTS summary

---

[19] Even if the public duty doctrine does not apply, and even if Mr. James has a cause of action for negligence against the officers, there are no issues of fact that preclude summary judgment on this claim with respect to Officers Chin and Bunge. As discussed above, Officers Chin and Bunge did not use excessive force against Mr. James, and accordingly could not be said to have breached any duty toward him. On this additional ground, there is no basis for holding these two officers liable with respect to Mr. James's negligence claims. *See Jiminez*, 2010 WL 3061799, at *16.

1  judgment to Defendants with respect to Mr. James's (1) claims of excessive force against

2  Officers House, Chin, and Bunge; (2) claims for racial profiling against Officers House

3  and Chin; and (3) claims for negligence against Officers House, Chin, and Bunge.  The

4  court also GRANTS summary judgment to Defendants with respect to Mr. James's

5  claims for assault and battery against Officers Chin and Bunge, but DENIES Defendants'

6  motion for summary judgment with respect to Mr. James's claim of assault and battery

7  against Officer House.  The court GRANTS summary judgment to Defendants with

8  respect to Mr. James's claim against the Department for negligent training and

9  supervision on the basis of Mr. James's concession that this claim should be dismissed.

10 Finally, the court GRANTS Defendants' motion for summary judgment with respect to

11 Mr. James's claim of respondeat superior against the City except to the extent of any

12 liability that may arise on the basis of Mr. James's claim against Officer House for

13 assault and battery.

14         Dated this 12th day of December, 2011.

15

16

17         _____

18         JAMES L. ROBART
           United States District Judge

19

20

21

22